UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) CAUSE NO.: |
| | ) 4:15-CR-00016-SEB/VTW |
| | ) Indianapolis, Indiana |
| -v- | ) **January 24th, 2017** |
| | ) 2:00 p.m. |
| ROBERT D. JENKINS, | ) |
| | ) |
| Defendant. | ) |


**Before the Honorable**
**SARAH EVANS BARKER, JUDGE**


OFFICIAL REPORTER'S TRANSCRIPT OF
SENTENCING HEARING


**For Government:**          Bradley P. Shepard, Esq.
                            Assistant U.S. Attorney
                            United States Attorney's Office
                            10 West Market Street
                            Suite 2100
                            Indianapolis, IN  46204


**For Defendant:**          Mark Inman, Esq.
                            Attorney At Law
                            141 East Washington Street
                            Suite 200
                            Indianapolis, IN  46204


**Court Reporter:**          Laura Howie-Walters, FCRR, CSR, RPR
                            Official Court Reporter
                            United States District Court
                            46 E. Ohio Street
                            Room 217
                            Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

1                        (Open court.)

2            THE COURT:  Good afternoon, all.

3            MR. SHEPARD:  Good afternoon, Your Honor.

4            MR. INMAN:  Good afternoon, Your Honor.

5            THE COURT:  Thank you for your indulgence on the

6     schedule.  A last minute matter arose and that's the life we

7     all chose to live a long time ago.  Last minute matters arise

8     from time to time.  So thank you for indulging mine.

9            You may be seated.  Good to see you.

10           Ms. Rota, would you call the matter before the

11    Court, please.

12                    (Call to order of the Court)

13           Mr. Inman, always nice to have you in court, sir.

14           MR. INMAN:  Good to see you, Your Honor.  Thank you.

15           THE COURT:  Would you escort Mr. Jenkins to the

16    podium, please?

17           MR. INMAN:  Yes, ma'am.

18           THE COURT:  Mr. Shepard knows I feel the same way

19    about him.

20           MR. SHEPARD:  Thank you, Your Honor.

21           THE COURT:  I just see him a little more often.

22           Good afternoon, sir.

23           THE DEFENDANT:  Good afternoon, Your Honor.  I'm

24    trying to pull my shirt down.

25           THE COURT:  Okay.  Can you help him, Mr. Inman?

1    It's hard to negotiate when you have your restraints on I

2    know.

3                THE DEFENDANT:  Thank you.

4                MR. INMAN:  There we go.

5                THE COURT:  Let me establish for the record that you

6    are Robert D. Jenkins, the same person named by the clerk when

7    she just called this matter?

8                THE DEFENDANT:  Yes, Your Honor.

9                THE COURT:  What is your age now, Mr. Jenkins?

10               THE DEFENDANT:  Fifty-two.

11               THE COURT:  You have your GED, it says in the

12   report; is that right?

13               THE DEFENDANT:  Yes, Your Honor.

14               THE COURT:  So you can read and write the English

15   language?

16               THE DEFENDANT:  Yes.

17               THE COURT:  I know you've been in custody, but prior

18   to coming to court today, have you consumed any substance,

19   alcohol, medicine or narcotic, that would interfere with your

20   ability to understand and participate in this hearing?

21               THE DEFENDANT:  No, Your Honor.

22               THE COURT:  Are you under the care of a doctor for

23   any condition that might interfere?

24               THE DEFENDANT:  Just over-the-counter antacid.

25               THE COURT:  That medicine brings you back to a point

of closer to normal function; is that right?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

THE DEFENDANT:  Just heartburn, acid reflux.

THE COURT:  It happens about this age.

THE DEFENDANT:  Yes.

THE COURT:  So I understand that.

On August 31st, 2016, you were before the Court for entry of a plea, which you did enter, pleading guilty to Count 1, the offense of production of child pornography.  The Court accepted your plea and found you guilty in accordance with that.

Thereafter, this matter was referred to the probation department for purposes of preparing a Presentence Investigation Report.  That report has been prepared now and circulated for all to review.  I'm going to use the report in this hearing and take up today the issues that the Court has to decide with respect to a sentence in light of your conviction.

So that's your reason for being in court today; is that how you understood it, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, speaking of the Presentence Investigation Report, did you have an opportunity to read the report carefully and discuss it with Mr. Inman?

1          THE DEFENDANT:  Yes, I did, Your Honor.

2          THE COURT:  And, Mr. Inman, did you have sufficient

3    time to review the report and discuss it with Mr. Jenkins?

4          MR. INMAN:  I did, Your Honor.

5          THE COURT:  Mr. Shepard, have you had sufficient

6    time to review the report and prepare?

7          MR. SHEPARD:  Yes, Your Honor.

8          THE COURT:  Mr. Jenkins, when you read through the

9    report, you probably noticed that it has two kinds of

10   information.  One part has to do with you in a biographical

11   sense, which is to say that it summarizes all of those

12   biographical details that are particular to you and your life.

13   So anyone who reads the report learns, as I did, about your

14   childhood and your parents, your siblings, your upbringing,

15   your education, your health, your work history, all of those

16   things, all those biographical details.

17          The other part of the report has to do with this

18   offense that you've been found guilty of and how all the

19   various sentencing options apply, the statute and the

20   guidelines and any other factors that may bear on the decision

21   that has to be made with respect to a reasonable sentence.

22          So did you notice that about the report, that it has

23   those two kinds of information?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  This is a document, as you can tell

then, that's personal to you.  And as such, we keep it in a

confidential status in the court's records.  So you don't need

to worry about it getting out to the media or to the public.

Its uses are limited by law and by regulation to only a few

authorized recipients, such as the probation department and

the court, the Bureau of Prisons and so forth.

Beyond that, access will not be permitted.  So you

don't need to worry, as I said, about the report reaching

other hands that might cause some problems with family members

or some security issues because of the dissemination of the

document.

Besides the report itself, I have the victim impact

statements.  There were four.  One was in writing.  Three were

by video.  And I've reviewed all of those victim impact

statements.

Did you have an opportunity to review those as well?

THE DEFENDANT:  Yes.

MR. INMAN:  Yes, Judge.  We met last Thursday and

discussed those, and he had an opportunity to review them.

THE COURT:  Did he review them?

MR. INMAN:  He reviewed the written one.  The

Exhibit C was consistent with the allegations of his sister

that were in a 302, and he chose not to watch that or the

other two statements.

THE COURT:  The victim of this particular offense,

1    the young nine-year-old-girl, did he read those --

2              MR. INMAN:  Yes.

3              THE COURT:  -- or --

4              MR. INMAN:  Well, no, he didn't review the video.

5              THE COURT:  Or otherwise review them on the video?

6              MR. INMAN:  He did not want to review the video.  I

7    gave him the opportunity.  We just talked generally about what

8    the statement said, and we don't refute the statements.

9              THE COURT:  I just missed what you said. I'm sorry.

10             MR. INMAN:  Of the four exhibits, the written

11   exhibit he reviewed --

12             THE COURT:  Yes.

13             MR. INMAN:  -- which is Exhibit D.

14             Exhibit C is the statement from his step sister or

15   half-sister --

16             THE COURT:  His half.

17             MR. INMAN:  -- which we refute.

18             THE COURT:  You refute?

19             MR. INMAN:  Yes, we deny that.  It was consistent

20   with the 302 report we'd been provided some time ago, which is

21   noted in the notice by the Government.

22             THE COURT:  How do you know it's consistent?

23             MR. INMAN:  Well, I've seen it.

24             THE COURT:  You've seen all the victim impact

25   statements?

1       MR. INMAN:  Yes.  And I told him we were just going

2  to come in and refute that, and he was fine with that.

3       And then as far as --

4       THE COURT:  But his knowledge of it is from the 302?

5       MR. INMAN:  Yes.

6       THE COURT:  He did read the 302 then?

7       MR. INMAN:  Yes, he has a copy of the 302.  He's had

8  it for some time.

9       THE COURT:  Then there was a child who was the

10  victim here and another child?

11       MR. INMAN:  Well, the child and the child's mother.

12       THE COURT:  That's right.  The child and the child's

13  mother.  Were they reviewed?

14       MR. INMAN:  They were not reviewed by him.  I gave

15  him the opportunity.  I had them.  I reviewed them. I told him

16  generally what they said.  He said that's what he thought that

17  they would say.  And so, you know, we have no refutation to

18  that or nothing to present as to that.

19       THE COURT:  All right.

20       MR. INMAN:  So he's aware of them.  He chose not to

21  review them.  I summarized them for him.  He's aware of what

22  they said.  It's no surprise to him as to what they said.  And

23  I feel confident that he understands.

24       THE COURT:  I assume there was no surprise.  He pled

25  guilty to the offense and they are the gravamen of the

1     offense.

2               MR. INMAN:  Right.

3               THE COURT:  So I have reviewed them, which you need

4     to know.  Besides those victim impact statements and the

5     matters that have been filed with the court, nothing else has

6     come to me that I've withheld from you.  So there have been no

7     other communications, no letters, no e-mails, nothing like

8     that.  So you know everything that I know on the basis of

9     which I'll make a sentencing decision today.  Do you

10    understand that?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  Now, the point at which we're headed in

13    this hearing is for me to have a clear enough understanding of

14    the offense conduct and what led up to it, and the harm that

15    was caused by it and so forth, that all of those factors can

16    be folded into the final decision.  And to the extent that I

17    succeed in incorporating those factors, it will be deemed a

18    legally-reasonable sentence, and that's my responsibility is

19    to impose a legally-reasonable sentence.

20              Now, you know what those factors are, by and large,

21    that I'll be taking into account because they're laid out in

22    the report, which you've read.  And the probation officer,

23    Miss Neat, has included them back pretty close to the last

24    page, usually close to her signature.  And so it is on page

25    17.  Do you have that, Mr. Inman, in paragraph 85?

1        MR. INMAN:  Yes.

2        THE COURT:  See those lettered subparagraphs in

3   numbered paragraph 85; do you see those, Mr. Jenkins?

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  Those are lifted right out of the

6   statute and put into this report.  And so these are the legal

7   requirements that the Court has to take into account in

8   fashioning a sentence.  And as I said, to the extent that I

9   succeed in doing that, the sentence will be deemed a

10  legally-reasonable sentence.

11       So, for example, the first thing is the nature and

12  circumstances of the offense, and the history and

13  characteristics of you.  The second one is the sentence has to

14  reflect the seriousness of the offense and so forth.  I won't

15  read them all to you.  You've read them, but that's what I'm

16  listening for and thinking about.

17       We also go through a sentencing guideline

18  determination.  The guidelines are important.  They don't have

19  the last word on the decision, but they inform my decision.

20  And the reason they're important is because they incorporate

21  many of these statutory factors.

22       So we do a correct guideline application and then we

23  say okay, that's how the guidelines apply.  Is that reasonable

24  in Mr. Jenkins case.  And so we go through that analytical

25  process in fashioning a sentence.  I'll hear from everyone

before the decision's made and try to take into account the factors that are raised by you and by the lawyers, but that's how we get to that final decision with respect to a sentence.

Do you understand that, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Is what I've told you basically what Mr. Inman has told you about the process we'll follow today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And do you have any questions you want to ask me about the process that we'll follow?

THE DEFENDANT:  No.

THE COURT:  Okay.  Now, when the sentencing guidelines were applied, the total offense level was 40 and the criminal history category was two.  Do you remember how we got to those numbers?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  In using the guideline manual and the sentencing table and so forth?

THE DEFENDANT:  (Nodded head.)

THE COURT:  Okay.  And then the report was circulated for all to review, and those were the conclusions that the probation officer reached.  The Government, according to the addendum, has no objections.  Is that true, Mr. Shepard?

MR. SHEPARD:  It is, Your Honor.

1          THE COURT:  And with respect to the defendant's

2     review, there are a few objections, two in particular, along

3     with some additional information that came from the defendant,

4     but in terms of objections, there were two.

5          The first one is directed at paragraph 36.  The

6     objection is that you, Mr. Jenkins, did not plead guilty to

7     child molesting in Count 2.  That charge was reduced to sexual

8     misconduct with a minor for purposes of the plea agreement.

9          The probation officer responded.  Is that your

10    response there, Miss Neat?

11         PROBATION OFFICER:  Yes, it is.

12         THE COURT:  So per the plea agreement in that cause

13    number, you pled guilty to Count 2, which was a child

14    molesting offense, a class C felony, and Count 5, sexual

15    misconduct with a minor, also a C felony.  So that's from the

16    plea agreement.  Do you have something to rebut the plea

17    agreement?

18         MR. INMAN:  We do, Your Honor.  As a matter of fact,

19    Miss Neat tracked it down yesterday.  The judgment in that

20    case was for two counts of sexual misconduct.  So Count 2

21    actually was sexual misconduct.

22         We weren't able -- for some reason, the plea

23    agreement read "child molest," but the court order and the

24    final order is "sexual misconduct."  My guess is there was an

25    amendment during the plea negotiation -- after the signing of

1   the plea but maybe in open court.  But there's no question

2   that the judgment issued is for two counts of sexual

3   misconduct.

4           THE COURT:  Is that true, Miss Neat?

5           PROBATION OFFICER:  (Inaudible.)

6           THE COURT:  You have to speak up.

7           PROBATION OFFICER:  That is correct.  I received a

8   judgment today, and it is two counts of sexual misconduct.

9           THE COURT:  Okay.  When I asked you just a minute

10  ago is this still your response, what's written here in the

11  addendum is not your response.  Today you have new material;

12  is that right?

13          PROBATION OFFICER:  That's correct, Your Honor.

14          THE COURT:  And so your view is that the position

15  taken by the defendant is correct?

16          PROBATION OFFICER:  That's correct.

17          THE COURT:  But it doesn't change the guideline

18  application?

19          PROBATION OFFICER:  That's also correct.

20          THE COURT:  So we'll make that change, that

21  correction, to reflect the review of that document which came

22  in pretty close to court time.  It's not your fault.  It's

23  just that we need to correct it.

24          PROBATION OFFICER:  Yes, Your Honor.

25          THE COURT:  And objection No. 2 as it's written

1  here, Mr. Jenkins will argue that his instant conviction and

2  his prior conviction do not serve to qualify him for the

3  five-level increase as a repeat offender as laid out in

4  paragraph 30.

5        MR. INMAN:  Your Honor, when I filed that objection,

6  I was still trying to clarify what the convictions were for,

7  the sexual misconduct and what we just went through.

8        THE COURT:  Right.

9        MR. INMAN:  I'm satisfied that sexual misconduct

10 qualifies as a covered sex crime, so I withdraw that

11 objection.  I think the five levels -- it's in the plea

12 agreement.  We don't have a valid argument against it.  I just

13 want the Court to understand why I did that because we were

14 still trying to clarify what the final judgment was from the

15 first conviction.

16       THE COURT:  Thanks for that explanation, and I'll

17 show that that objection is withdrawn.

18       MR. INMAN:  Thank you, Your Honor.

19       THE COURT:  So I have handled all the objections

20 that you wanted to interpose?

21       MR. INMAN:  Yes, Your Honor.  We have submitted a

22 couple of factual corrections that Miss Neat made in the

23 revised version, and so we have nothing else as far as that's

24 concerned.

25       THE COURT:  Okay.  So the rest of the report

1   conforms to my own judgment as to the correct application of

2   the guidelines and a complete collection of information that

3   the Court needs to consider in imposing a sentence.  So I

4   adopt the report, with that one clarifying ruling, as it was

5   circulated.

6          The clarifying ruling did not change the guideline

7   application.  So based on the guidelines and this report,

8   which I adopt as my own, the total offense level is 40 and the

9   criminal history category is 2.

10         The plea agreement -- let me just reach back to say

11  in the record for this proceeding -- did not have specific

12  areas of agreement between the Government and the defendant.

13  The only reference to the sentence that shows up in the plea

14  agreement is that if there is a guideline sentence imposed,

15  that the defendant has agreed to waive his right to appeal the

16  sentencing decision.

17         So that's the only connection between the plea

18  agreement and the guidelines.  Is that your understanding,

19  too, Mr. Inman?

20         MR. INMAN:  Umm --

21         THE COURT:  All the other terms were left to the

22  Court to decide.

23         MR. INMAN:  We had -- we had some sentencing

24  guideline stipulations.

25         THE COURT:  You did, but they are not binding on me.

1          MR. INMAN:  No, that's correct, I'm sorry.

2          THE COURT:  There are agreements between the two of

3     you.

4          MR. INMAN:  I'm sorry, yes, that is correct.

5          THE COURT:  So the only one that's binding on me in

6     terms of the plea agreement is if a guideline sentence is

7     imposed, the defendant's waived his right to appeal that

8     decision.

9          MR. INMAN:  I'm sorry, I misunderstood.  Yes, I do

10    agree.

11         THE COURT:  Is that your view, too, your

12    recollection, Mr. Shepard?

13         MR. SHEPARD:  It is, Your Honor.

14         THE COURT:  So the guidelines that apply, the period

15    of incarceration you remember from my prior explanation under

16    the statute, the period of incarceration is 15 to 30 years.

17    The guideline range is 324 months up to 405 months.  The

18    supervised release term, do you remember what supervised

19    release is?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Under the statute, it was five years to

22    life, and that's what shows up as the guideline as well, five

23    years to life.

24         You're not eligible for probation under the

25    guidelines or the statute.  The fine maximum set by statute is

1    250,000.  Under the guidelines, it's a low of 25,000 up to

2    250,000.

3            Restitution is to be determined.  We'll get to that.

4    There's no figure that's been proffered to the Court.  It

5    occurred to me, as I reviewed the victim impact statements,

6    that there would be good reason for restitution in terms of

7    providing financial support for counseling and for mental

8    healthcare that resulted to the victims, but apparently no

9    one's been forthcoming with any amounts; is that right,

10   Mr. Shepard?

11           MR. SHEPARD:  Your Honor, the victim is receiving

12   counseling.  It's currently being paid for and there are

13   provisions for ongoing payment of that out of the Crime Victim

14   Rights Fund, which is essentially the grant where general

15   restitution payments come through from -- into the Department

16   of Justice.

17           So as of yet, I clarified this with the agent this

18   morning, there have been no out-of-pocket expenses, and at

19   least at the foreseeable time, there are not out-of-pocket

20   expenses born by the victim or her family.  And that's the

21   reason no amount has been submitted to the Court.  It's

22   currently being paid for out of the Crime Victim Rights Fund.

23   The FBI's victim witness staff, Miss Odella (phonetic),

24   assisted the victim and reapplied for that earlier this year

25   and it was reapproved.  So she is still getting that paid for

1  by the Crime Victims Rights group.

2         THE COURT:  Thank you, Mr. Shepard.  That's helpful.

3         So in terms of a restitution figure as such, there's

4  no sentencing issue for the Court to decide.  There is the

5  special assessment, which is the fee that has to be paid to

6  the Clerk of the Court.  That's that nonwaivable fee of a

7  hundred dollars for each felony conviction.  So can that be

8  paid today, Mr. Inman?

9         MR. INMAN:  No, Your Honor.

10        THE COURT:  So we'll make arrangements for that

11 through the Inmate Financial Responsibility Program, which is

12 the euphemism for prison industries, because it's nonwaivable.

13        Those are the statutory provisions and the guideline

14 that apply to an offense level 40 and a criminal history

15 category 2.  Do you agree with that extrapolation, Mr. Inman?

16        MR. INMAN:  I do.

17        THE COURT:  And do you, Mr. Shepard?

18        MR. SHEPARD:  Yes, Your Honor.

19        THE COURT:  So that's the beginning point,

20 Mr. Jenkins, for the Court's decision making as to a

21 reasonable sentence.  And it's appropriate for you to speak

22 and to tell me whatever it is you want me to know and think

23 about and take into account.

24        Once the sentence is imposed today, it's likely to

25 be a final matter.  So don't put off till some other time

whatever it is you want me to know and think about assuming

there will be another time because, as I said, this is likely

to be the final resolution of the sentencing issue by the

Court.

After I hear from you, sir, I'll hear from Mr. Inman

on your behalf, and then I'll hear from Mr. Shepard on behalf

of the Government.  But you may lead off.

THE DEFENDANT:  I just-- there's no excuse for what

happened.  I mean, I can't stand here and make any excuse.  It

was something that was stupid, and I'm terribly sorry that it

happened and anybody got hurt out of it.

THE COURT:  That's really worse than stupid, isn't

it?

THE DEFENDANT:  Yes, it is, Your Honor.

THE COURT:  Because it was hugely damaging.

THE DEFENDANT:  Yes.

THE COURT:  I sort of wish you had listened do the

Victim Impact Statements from them directly.  I know Mr. Inman

summarized them but --

THE DEFENDANT:  I didn't know that the mother put in

an impact statement.  I wasn't clear with that.  I knew the

daughter did one, but I wasn't clear that the mother did one

also.

THE COURT:  Well, the mother's statement basically

corroborated the difficulties that her daughter has had in

1  school, with her friends, and with her inability to focus on

2  schoolwork.  There are certain classes that you take.  She's

3  only 11 now, and this happened when she was nine.  There are

4  certain classes you take when you're in junior high school and

5  that age bracket, and about learning about bodily changes and

6  so forth.  She can't even bring herself to go to those classes

7  because of what you inflicted on her, and not just once but

8  over and over many times in a way that left her completely

9  victimized and took advantage of her vulnerability, her

10  dependence, her youth.  She didn't know what to do.  She was

11  completely overwhelmed it.

12           THE DEFENDANT:  It was only one time.  It was one

13  set of pictures.

14           THE COURT:  There were other times when you were

15  doing conduct like this, right?

16           THE DEFENDANT:  No.

17           THE COURT:  Oh, I think so.  That was part of the

18  victim witness testimony that I heard.

19           THE DEFENDANT:  All I did was took some pictures one

20  day.

21           THE COURT:  Well, you have a prior conviction, don't

22  you, for child molest?

23           THE DEFENDANT:  Not sexual misconduct, but --

24           THE COURT:  That offense is what I'm talking about.

25           THE DEFENDANT:  Oh, okay.

1    THE COURT:  It was similar conduct, wasn't it?

2    THE DEFENDANT:  Excuse me?

3    THE COURT:  It was similar conduct, wasn't it?

4    THE DEFENDANT:  Well, that included touching.

5    THE COURT:  Right.  It was similar to sexual

6  predatory behavior, wasn't it?

7    THE DEFENDANT:  Yes, Your Honor.  Yes, Your Honor.

8    THE COURT:  Yes.  So there's a pattern.  And

9  actually, if you heard the victim impact statements yourself,

10  you would hear how these victims said that this -- these

11  relationships that you were involved in and the kinds of

12  activities that you engaged in have occurred often enough and

13  with enough seriousness that everyone who was touched by it,

14  even the mother and her half-sister and so forth, have not

15  been able to get over it, that they are suffering still and

16  severely because of it.

17    THE DEFENDANT:  Nothing ever happened --

18    THE COURT:  So this is more than stupid behavior.

19  This was an offense that took you way beyond anything that was

20  either permissible in terms of your relationship with them or

21  permissible under the law.  That's why the penalties are so

22  severe.

23    THE DEFENDANT:  Yes, Your Honor.

24    THE COURT:  And the fact that you had this prior

25  conviction, I think the people down in Seymour must be sort of

glad to have you put in a place where you can't hurt anybody

anymore because you were a law enforcement problem to them,

too, right?  Isn't that true?

THE DEFENDANT:  Not really.

THE COURT:  Well, you want me to read it to you from

the presentence report?  Did you read the presentence report?

THE DEFENDANT:  I've only been arrested twice in my

life, or three times in my life.

THE COURT:  Well, there was the prior conviction.

THE DEFENDANT:  Yeah, I was arrested for that and

did time.  I was arrested for a check deception and I was

arrested for this case.

THE COURT:  Then in March of 2015, the mother of

this girl came on these photographs that were taken and had to

go see the Jennings County Police, right?

THE DEFENDANT:  No.

THE COURT:  Who?

THE DEFENDANT:  Jackson County.

THE COURT:  Jackson County, okay.

THE DEFENDANT:  But that was the third time I had

been arrested in my life.

THE COURT:  And they had to involve Special Agent

Prewitt of the FBI, right?  And he was present for the

interviews with the victims because I heard him and he was

referred to.  And it wasn't until Special Agent Prewitt

1   started investigating that people felt free to come forward

2   with the disclosures that they finally made.  They were deeply

3   hurtful.  People were trying not to talk about them because --

4   just trying to repress them because it was conduct that they

5   didn't know how to manage in their heads.  It has to do with

6   your self-concept.  How you think about yourself.  And when

7   you've been violated in those ways, sometimes there's no

8   recovery.  But even when there's a recovery, it's hard work.

9   It takes a lot of psychological effort to get past the

10  offense.

11          So this, you didn't just trip up here.  You didn't

12  just do something silly and stupid.

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  You were perpetuating serious offenses

15  and affronts to very vulnerable victims.  So that's a signal

16  to me that there's something that is haywire with respect to

17  your view of your own responsibilities and your own

18  proclivities, your own needs physically.  You think that's

19  true?  Do you think there's something that's haywire, that's

20  amiss?

21          THE DEFENDANT:  It could be.  I was --

22          THE COURT:  This isn't normal behavior, is it?

23          THE DEFENDANT:  No, it isn't, Your Honor.

24          THE COURT:  So whatever it was that compelled you to

25  do it is not normal.

1          THE DEFENDANT:  No.

2          THE COURT:  So maybe I shouldn't use the word like

3   "haywire," but there's something that allowed you to do this

4   despite the awfulness of it.  You still were driven to do it

5   by something, some need, some desire and so forth, right?

6          THE DEFENDANT:  Yes, Your Honor.  There was a

7   15-year span, but yes, Your Honor.

8          THE COURT:  So that -- 15-year span, what does that

9   say, that this has been a long-term problem?

10          THE DEFENDANT:  No, it just means, I never --

11          THE COURT:  Events two times, 15 years apart, you

12   got caught?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  So part of the presentence report

15   formulation of conditions of supervised release calls for

16   ongoing mental health treatment and restrictions of you so

17   that you can't be around other people who would be victims.

18          So one of the reasons I'm bringing this up and

19   pushing sort of hard about this is because it seems to me that

20   you need this kind of mental health treatment and care while

21   you're incarcerated, especially since it's such a long period

22   of time.  So I bring it up for that reason.  Do you think

23   that's true?  Do you need that?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  I mean, are you just saying yes because

1   I asked you or do you really think that?  I mean, when you

2   said it you short of shrugged like --

3              THE DEFENDANT:  Yeah, I feel that counseling would

4   probably help me a lot.

5              THE COURT:  Well, this isn't behavior that you can

6   explain either.

7              THE DEFENDANT:  No, I can't.

8              THE COURT:  I mean because when you say it was

9   stupid, that's not an explanation.  So I don't think you can

10  explain it either and it's abnormal, besides being illegal.

11  That's usually a sign that there's a mental health component.

12  So I can make that recommendation to the Bureau of Prisons and

13  will make it if you think it's going to take you in a helpful

14  direction, but I'm not going to do it if you're just going to

15  waive it off or think it's silly or unnecessary or whatever.

16  So what's your view about that?

17             THE DEFENDANT:  I believe it would help me because

18  it was unacceptable behavior and I cannot explain why it

19  happened.  It should have never happened.  It should never

20  happen to any child.  And apparently there's something not

21  right that I need to -- need help to figure out what's wrong

22  so I can correct it or have it corrected.

23             THE COURT:  Right.  That's a much more plausible

24  statement from you than the one you started out with.

25             THE DEFENDANT:  Yes.

1        THE COURT:  That there is something wrong.  This is

2   behavior that's beyond the pale.  One of the things that you

3   would have picked up on as I did, I think, you would pick up

4   on it as well if you had watched the victim impact statements,

5   is how fragile this young girl is, who was nine when she was

6   victimized by you, and is 11 and still suffering.

7        So it was heartrending, and her mother says that

8   before all of this happened, she was a happy-go-lucky,

9   friendly, vivacious, high energy sort of kid, likeable,

10  et cetera.  Now she's just brought down by the consequences of

11  this.  And it's too bad that you didn't let yourself -- I

12  mean, I guess I understand why you didn't want to see it.  It

13  just increases the agony, but if you had seen it with your own

14  eyes, you couldn't help but be struck by the impact of this.

15  And that's another way to underscore the seriousness of the

16  conduct and the huge need that apparently exists for you to

17  figure out what is causing this, where is this coming from.

18       Now your half-sister, I heard Mr. Inman say, you

19  don't agree with her statements.  She's sort of a mental

20  wreck, too.  And she is suffering from anxiety attacks and

21  depression, has extended accounts really of times when you

22  took advantage of her when she was a child.  And that your

23  mother always sided with you, she said, and so she was left

24  with this feeling that she should repress it.

25       Whether or not you could tell that story the same

1    way or whether or not you think she's got her own version of

2    it, it's unmistakable that she's a wreck.  She's a mental

3    wreck, and she attributes it in large part to you.

4              So whatever happened, you can say she exaggerated or

5    you can say that she's worried about it so long she's made up

6    some of it, but I don't think she's brought herself to the

7    state she's in at age 41 without there having been some

8    provocation.

9              THE DEFENDANT:  We didn't even live in the same

10   house.

11             THE COURT:  I know, she said that.  She said that

12   you stayed often at your grandmother's.

13             THE DEFENDANT:  I lived at my grandmother's.

14             THE COURT:  And she stayed there, too, she told me.

15             THE DEFENDANT:  No.

16             THE COURT:  She said she got sent there often.  She

17   didn't live there but she got sent there often because your

18   mother was working, and the grandmother was the babysitter.

19             THE DEFENDANT:  And when she was there, I was

20   usually gone.

21             THE COURT:  Well, not all the time apparently.

22             THE DEFENDANT:  There's a ten years difference

23   between me and her.

24             THE COURT:  That's what she said.

25             THE DEFENDANT:  And usually when she was there, I

1   was out with my friends and gone.

2           THE COURT:  Well, the "usually" part may be true but

3   not always.

4           THE DEFENDANT:  But nothing ever happened.

5           THE COURT:  She tells the story of the ways in which

6   you took advantage of her and victimized her given the

7   ten-year age difference of your being 15 and she was five.  So

8   I can't sort all that out.

9           You didn't look at the victim impact statement.  I'm

10  just telling you what I saw, and that is she's a mess.  She's

11  a mental and emotional mess.  And if it's due in any way to

12  what you did, then you bear some responsibility for that.

13          THE DEFENDANT:  I'm not responsible for what --

14  because I have never done nothing with her.

15          THE COURT:  Okay.  Well, that's not how she tells it

16  or how she remembers it.

17          THE DEFENDANT:  Well, I mean, it's -- she's always

18  been high strung and Mom's always been there for her, which

19  didn't bother me.  I mean, Mom raised her.  I lived with my

20  grandparents.  My older half-brother lived with my

21  grandparents, and my oldest half-brother lived with his aunt.

22  So she was the only one our mother raised.

23          As far as -- I read the impact statement that she

24  wrote, or the statement she wrote, as far as me asking her for

25  pictures and stuff, that never happened.  If I ever wanted to

see anything like that, all I had to do was go to a bar on the
weekend because she was walking around with her shirt off half
the time, and I would turn around and leave.  That's my
sister.  I don't want nothing to do with her.  Never did.

Why she's bringing up stuff that never happened or
telling stories, I have no idea.  She's always resented me but
that's -- I've always made my own way and she's always lived
off our mother, which is now in a nursing home, and my sister
took over her house, which I didn't have a problem with.

So I don't know why she's trying to ruin me even
more than I am right now but I have never done nothing.

THE COURT:  Happily I don't have to resolve that
case.  I'm resolving the one where the victim was the
nine-year-old who's now 11, who's also a mess emotionally.
And her mother who feels huge guilt for leaving her daughter
in your charge, and therefore vulnerable to the experiences
that underlie this prosecution.

So I know families get themselves all tied up in
knots and there are a lot of themes that were running through
your home when you were growing up with half-brothers and
half-sisters and people taking care of you like your
grandmother so that your parents could work and so forth.  But
just judging from the impact statements, it takes your breath
away.

Why do you think that the state prosecution when you

1    were in prison for similar conduct for about three years,

2    something like that -- wasn't it a three year sentence?

3              THE DEFENDANT:  Three years.  I done 18 months.

4              THE COURT:  Why do you think that didn't have an

5    attention-getting affect?  Why didn't that convince you that

6    you can't go down this road again?

7              THE DEFENDANT:  I thought it had because, I mean, I

8    was out for 11 years, and then I don't know what happened.  I

9    went through the two years probation, supervised.  I went

10   through the ten years on the registry with no problems

11   whatsoever.  And all of a sudden just -- I don't know what

12   happened.

13             THE COURT:  Is that another way of saying that it's

14   a deep-seated enough problem that you need some help trying to

15   sort it out?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  That's what I thought, too, but it's

18   better if you see it.

19             Mr. Inman, what would you say on Mr. Jenkins'

20   behalf?

21             MR. INMAN:  Well, you know, it strikes me, Judge,

22   90 percent probably of defendants in this situation have been

23   abused themselves.  It's learned behavior.  We don't know that

24   from Robert's past.  We've not -- he's not --

25             THE COURT:  There's nothing in the report.

1          MR. INMAN:  We don't know.  I don't know.  He has

2    not said anything and he's told them.  Like you said, from

3    people coming in and out of the house and the situation, you

4    can infer perhaps, but we don't have any positive -- no

5    memories of that, no allegations of that when he was young.

6    But it's entirely possible, and that's why these types of

7    things reveal themselves at times, that you think you have

8    control, and then all of a sudden you put yourself in the same

9    position where it's going to happen again.  That's kind of

10   what happened here.

11         THE COURT:  So that's another reason for mental

12   health treatment --

13         MR. INMAN:  Yes.

14         THE COURT:  -- because it might be in that setting

15   he can come to a deeper understanding.

16         MR. INMAN:  Absolutely, Judge, but that kind of goes

17   into what my point is.  He's 52 years old, and you can fashion

18   a combination of executed time and then supervised release for

19   life.  And the question is when do we break from being in

20   prison to -- when do you feel comfortable breaking from having

21   him in prison to letting him out and being on supervised

22   release and getting further counseling and having a chance not

23   to die in prison.  I mean, that's what this is about.

24         You know, the positive thing is, as he said, he did

25   respond to supervision.  He did his time.  He was out on

probation for two years.  I'm assuming he went through some

sort of sex offender probation at that time.  And counseling,

none at all?

THE DEFENDANT:  None.  It was not ordered.

MR. INMAN:  That should have happened --

THE DEFENDANT:  It didn't.

MR. INMAN:  And it didn't.  But you were on the

registry.

THE DEFENDANT:  The only thing I did before I got

out of Indiana DOC was I done a parenting class, which that

was all they had me do.  Nothing else.

MR. INMAN:  So, I mean that doesn't justify any of

this, Judge, but the fact is that when he was supervised and,

you know, complying with the registry is not an easy thing.

Your hands are tied as to where you can live, where you can

go.  You have to stay a thousand feet away from a school and

church, and it's difficult.  And for him to be able to comply

with that, I think, at least says something about his ability

to respond to counseling, supervision and treatment.  He's

always worked.  He's been able to support himself and do some

positive things.

So, you know, was it the Thompson case that came

down two or three years ago, which has had tons of

resentencings as you're very familiar with?  That kind of asks

the trial court to balance in terms of probation with an

1    executed sentence, and I think this is an appropriate case to

2    do it.

3            One thing I would note about how the guidelines work

4    here, Judge, is that he gets -- for the same conviction, he

5    gets an additional criminal offense level, criminal history

6    level, and the five levels added to the offense level.  So he

7    kind of gets hit both ways with the way the guidelines work

8    there.

9            If you went back up one level, or if you went back

10   to criminal history 1, if you can picture the graph, you both

11   hit -- that guideline's 292 months to 325.  Does that -- you

12   know, I'm just saying instead of -- there's a little bit of

13   duplicity here in the way that the guidelines operate.  For

14   him to be punished both ways or to be heightened exposure both

15   ways, I would just ask you to just consider that.

16           I mean, as you always do, Judge, you've asked the

17   right questions.  You've got him to talk about himself.  You

18   know what this case is about.  So as far as 3553 factors, I

19   think protection is one of the factors, to protect society.

20   If he is on supervised release and he's 68 or 70 years old, I

21   think society's going to be protected, all right?

22           I think him being in prison for 15 or 16 or 17

23   actual years is enough deterrence with knowing that he's going

24   to have to comply with the onerous conditions of supervised

25   release once he gets out.

1      As far as other defendants are concerned, Your

2  Honor, we've seen sentences all across the board in this

3  district about these types of cases with repeat offenders or

4  multiple offenders.  I can't -- I always think of Jared Fogle

5  getting 14 years, and he had God knows how many victims.  He

6  wasn't necessarily a repeat offender, but he was -- that's

7  only because he hadn't gotten caught for quite some time.  I

8  always look back at that case.

9      But anyway, those are just the basic points I want

10  to make, Your Honor.  I think a sentence -- if you gave him

11  the 240-month sentence, that's 20 years, that means he would

12  do about 14 more years, probably about 15 more years.  He'd be

13  67 years old, and then lifetime supervised release.  I think

14  that satisfies both concerns that he have enough of a sentence

15  to punish him for what he's done, and that we protect society

16  by monitoring him until the end of his days, and he gets the

17  help that he needs.  That's what I would ask the court to

18  consider.  Thank you, Judge.

19      THE COURT:  Yes, thank you, Mr. Inman.  Thank you

20  for representing Mr. Jenkins, too.

21      Mr. Jenkins, you're fortunate to get a lawyer of

22  Mr. Inman's ability and experience to represent you.  He's one

23  of our best.

24      THE DEFENDANT:  Yes, Your Honor.

25      THE COURT:  Mr. Shepard, what's the Government's

PREWITT - DIRECT/SHEPARD                    35

view?

        MR. SHEPARD:  Your Honor, before I argue, the
Government would actually like to call Special Agent Prewitt
and elicit testimony that specifically refutes two statements
that Mr. Jenkins stated in his allocution.

        THE COURT:  Mr. Prewitt, would you come to the well
of the court, please.  You don't need to take the stand, just
stand here, we'll hear you.  And would you be sworn, please.

        TODD PREWITT, PLAINTIFF'S WITNESS, SWORN

                  DIRECT EXAMINATION

BY MR. SHEPARD:

Q.  Agent Prewitt, can you please just briefly describe your
relationship in this -- or your familiarity with this case?

A.  I was the case agent for the FBI and worked on it once I
was contacted by the Seymour Police Department through its
conclusion.

Q.  And is it fair to state that this case got very close to
what appeared to be a trial or nothing posture?

A.  Yes.

Q.  And we were on the verge -- we, the Government, were on
the verge of going in front of the grand jury to request a
superseding indictment literally the day that Mr. Jenkins
signed his plea agreement; is that correct?

A.  That is correct.

Q.  And the subject of the superseding indictment was going to

1    be one additional image of the first series that was found by

2    Detective Barnes of the Indiana State Police, as well as a

3    second series of images taken on a second day, February 22nd;

4    is that correct?

5    A.   Correct.

6    Q.   Can you describe that second series of images for the

7    Court?

8    A.   Basically two to three images that were –– appeared to be

9    the victim was in a bathtub, nude.

10           THE COURT:  Same victim?

11   A.   Same victim.  The nine-year-old, now 11.  Completely nude

12   in the bathtub.  And there was a shower curtain and there

13   was –– it basically appeared as if a camera had been held over

14   the top of the bathtub and taken and pointed specifically

15   downward towards where the victim was.

16   Q.   And was Detective Barnes able to recover a time stamp on

17   one of those images?

18   A.   Yes.

19   Q.   Was that February 22nd?

20   A.   Yes, eight days after the first set of series, images,

21   that were recovered.

22   Q.   Which was February 14th?

23   A.   Correct.

24   Q.   And was the victim asked if she –– was she shown that

25   series and asked who was the taker of the picture of that

1    series of images?

2    A.   Yes.

3    Q.   Did she reply it was the defendant?

4    A.   Yes.

5    Q.   There was another statement that Mr. Jenkins stated as it

6    related to his step-sister or half-sister, that he never

7    wanted to have anything to do with her; do you recall him

8    saying that?

9    A.   Yes.

10   Q.   Through the course of this investigation, did you see

11   multiple attempts by Mr. Jenkins to contact his half-sister?

12   A.   Yes, she stated that he had placed calls while

13   incarcerated to speak with her, that she did not answer, and

14   he also wrote, I believe, multiple letters and even included a

15   self-addressed stamped envelope to write her back, which she

16   declined.

17   Q.   Was the subject of these calls and letters, he was seeking

18   an alibi, essentially a defense from her; is that correct?

19   A.   It was my understanding that he felt that his half-sister

20   would have been watching the victim at that time, and stated

21   that if that was the case, then there was no way he could have

22   committed the offense.

23   Q.   And is that why, at my direction, you went to interview

24   the half-sister?

25   A.   Yes.

PREWITT - CROSS/INMAN                     38

1   Q.  Were you going there at all to ask about prior instances

2   of molest?

3   A.  No, that -- that only came up at her -- you know,

4   basically bringing it up on her own voluntary acknowledgment.

5   Q.  You only went there to talk about whether or not she was

6   watching the child victim on the date in question?

7   A.  Yes, I wanted to see if that was accurate.

8   Q.  And she stated that she was not; is that correct?

9   A.  Right, that she could not recall, that the calendar that

10  they would have had that would have denoted that was thrown

11  away.  So she did not believe she would have watched that day,

12  but she wasn't a hundred percent because of the calendar.

13  Q.  And spontaneously, she made this disclosure to you?

14  A.  About the other involvement with the defendant, yes.

15          MR. SHEPARD:  Thank you, Your Honor.  No further

16  questions.

17          THE COURT:  Cross-examine, Mr. Inman?

18          MR. INMAN:  Thank you, Your Honor.

19                    CROSS EXAMINATION

20  BY MR. INMAN:

21  Q.  It wasn't inconceivable that she would have been watching

22  the victim at some point?

23  A.  I think it was inconceivable that she would have been

24  watching him --

25          THE COURT:  Look at me when you testify, please, so

1   that the court reporter can hear.

2   BY MR. INMAN:

3   Q.  She watched the victim at times?

4   A.  At times, correct.

5   Q.  It wasn't just completely out of the blue that she might

6   have been watching?

7   A.  No, that's correct.

8   Q.  That's what I meant.

9   A.  Yes, yes.

10              MR. INMAN:  Okay, that's all I have, Your Honor.

11              THE COURT:  Redirect?

12              MR. SHEPARD:  None, Your Honor.

13              THE COURT:  Thank you, Special Agent Prewitt.

14              And now I'll hear, Mr. Shepard, your statement on

15   behalf of the Government.

16              MR. SHEPARD:  Thank you, Your Honor.  I took Special

17   Agent Prewitt through that series of questions for two

18   reasons.  One, Mr. Jenkins specifically stated in his

19   statement of allocution to you that it was only one instance,

20   one series of pictures, with that victim.  The evidence simply

21   does not bear that out.  There were two.

22              Those images were provided to the defense.  It was

23   provided with the specific statement that we are planning to

24   go to the grand jury to seek a superseding indictment, which

25   was going to be a ten count indictment.  Six counts of

production under 2151(a), three counts of attempt under

2151(a), and one count of possession of child pornography.  So

he had that information and yet he stated what he stated to

you today.

As it relates to his half-sister, he stated he

didn't want to have anything to do with her.  Well, he wanted

to have things to do with her when he thought that she could

provide him with an alibi for the crime, but once he received

the 302, that not only was she not going to provide an alibi,

but she spontaneously disclosed acts of molest perpetrated

upon her, that's when that happens.  I felt that statement

was, while maybe true at this point, was at least insincere in

the way in which he got to the place of not wanting to have

anything to do with his sister.

I also thought that it lends a little bit of

credibility to the victim impact statement of the half-sister.

She had nothing to gain, no reason whatsoever to make that

disclosure to the FBI.  We were simply coming there to ask if

she had a record as to whether or not she was taking care of

Child Victim 1 on February 14th, 2015.

Through subsequent interviews of the half-sister, we

learned that she was in therapy and she had gotten to the

stage of therapy of confrontation, the stage where the

therapist encourages the victim to confront their accuser, to

take away, or excuse me, their aggressor, to take away the

power that the aggressor has over them, and that this had
obviously been bothering her for some time.

She wasn't looking to get out of any charges.  She
wasn't looking to receive anything.  This was a spontaneous
declaration that we otherwise had no knowledge of.  I think
that adds a lot of credibility to what she says.

Looking at the 3553(a) factors specifically, the
first thing we talk about is the nature and circumstances of
the offense.  This is an offense against the child.  This is
an offense that ripped her innocence, her dignity, and as you
have seen in the victim impact statements, quite frankly her
ability to function, away from her.  Through my own
interactions with the victim, she loves animals.  She's a
happy kid right until you start talking about what happened,
and then the switch flips immediately.

She doesn't want to look.  She feels instantly
uncomfortable with almost any man in the room.  She shuts down
into a tearing mess, very similar to what was seen on the
video, which was Exhibit A.

And that's after multiple instances of therapy.
These are the progress notes with her therapist.  Even in a
one-on-one situation, she can't even talk about, or at least
she couldn't, the specifics of what happened.  But I think the
implications are there by what we do know.

I think it's easy to infer that it was more than

just taking of the pictures.  When we talk about what she really gets broken up about at school, she can't go to classes where they do good touch/bad touch.  She can't go to health classes where they're talking about bodily development.  Those are the triggers.

The inference is deafening of why it's those specifics.  It's not just because he had her get undressed and take pictures.  His prior instances also show that that is most likely not what happened.

The child's own statements about the impact on her, and again we're talking about an 11-year-old girl and how she's able to talk about it through the tears.  She can't sleep.  She can't trust.  She scratches herself until she bleeds.

Her mother corroborates it.  She falls asleep in school.  She can't concentrate.  And that dovetails into factor No. 2, the history of the defendant, and specifically the victim impact statement of his first -- his prior stepdaughter, which was Exhibit No. 4.  And quite frankly, this is one of the most powerful impact statements I've ever read.

A lot of what the prior stepdaughter said is exactly what's happening to Child Victim 1 right now.  She talked about how she couldn't sleep, how her grades dropped.  She went to drugs.  We haven't gotten to that point thankfully.

1    But what we have here in Exhibit D are the

2    statements of a now 33-year-old woman who's able to more

3    eloquently talk about what happened to her, and it details

4    seven years of molests.  Started when she was five.  Went on

5    until she was 12.  Included instances of being blind-folded

6    and made to touch his penis.  Instances of oral sex.  Made her

7    witness him raping her brother who was two years older than

8    her.  Threats to keep both her and her brother quiet.  The

9    rage that she felt.  How she feels any time she's undressed

10   like she's being watched.

11   She talks about it a little bit at the end, what was

12   stated to Special Agent Prewitt, how hearing that it happened

13   again brought all that back up.  That's very similar to what

14   his half-sister in Exhibit C details.  What happened.  The

15   commonality is striking.

16   So that's four victims, four separate victims, which

17   takes us really to the only 3553(a) factor that this Court

18   should focus on, and that's to protect the public from future

19   offenses by this defendant.

20   The Government has already given him a benefit in

21   that it allowed him to plead guilty to one count, which set as

22   a statutory maximum, a penalty of 30 years.  Quite frankly, he

23   doesn't deserve any more benefit than that.

24   His half-sister said it best when she said "If he's

25   out, he'll reoffend.  He just can't help himself."

1        Mr. Jenkins says he can't explain why he does it. I

2   can explain it.  He has a sexual interest in children.  And

3   what he does is absolutely deplorable.  Thirty years, he still

4   has a chance to get out, but if he does, he'll be almost 80.

5   His ability to do this to another child would be significantly

6   limited.

7        And based upon the evidence, I don't think there's

8   any other sentence that would be reasonable.  He has

9   demonstrated a long-spanning conduct beginning at 15 to 51

10  that includes four different victims.  He can't even admit to

11  the full extent of his conduct to this Court today.  There's

12  no reason not to give him the statutory maximum penalty, and

13  that's what the Government is asking you to impose, Your

14  Honor.  Thank you.

15       THE COURT:  Is Exhibit D, which is the written

16  victim impact statement, the statement of the previous

17  stepdaughter?

18       MR. SHEPARD:  It is, Your Honor.

19       THE COURT:  And do you know when that would have

20  been -- when that would have occurred, the acts that are

21  alleged here would have occurred?

22       MR. SHEPARD:  She was 12 years old in 1999.  So if

23  we go back seven years, it would have began in 1992, and

24  according to her statement, continued uninterrupted from 1992

25  to 1999 when her brother -- it was her brother who actually

came forward to the authorities, and then the investigation
uncovered acts also occurred as to her, which is why there
are -- it was originally a five-count charging information but
he pled to two counts, one specifically conduct to --

THE COURT:  Was this the victim impact statement
with respect to the state charge?

MR. SHEPARD:  This is one that she gave to us when
we contacted her.

THE COURT:  It doesn't relate to the previous state
conviction?

MR. SHEPARD:  The conduct of the state conviction is
what happened at the very end.  If you'll look about, oh,
halfway through when she's talking about -- okay, he
started --

THE COURT:  Let me ask the question this way.  Is
the victim in the fourth statement, Exhibit D, the victim in
the state charge?

MR. SHEPARD:  She is.

THE COURT:  Okay.  That's what I was trying to
figure out.

MR. SHEPARD:  Sorry, yes.

THE COURT:  Okay.

MR. SHEPARD:  One of the acts that she described in
here was the subject of the charge in the state case.  And,
sorry, actually there's one other point I wanted to hit as it

1    relates specifically to the argument that 4B1.5 is double

2    counting.

3          4B1.5 doesn't punish victims.  It punishes conduct.

4    The guideline, by its terms, says it applies to multiple acts

5    whether or not those acts are charged.  So it is not double

6    counting the conviction.

7          What it is doing, it is counting any other conduct

8    that is an offense against the child, and there's multiple --

9    a child, and there are multiples.  There's seven years' worth.

10          THE COURT:  So this is conduct other than shows up

11   in the history?

12          MR. SHEPARD:  That's correct, Your Honor.

13          THE COURT:  Okay, I understand.

14          MR. SHEPARD:  The criminal history was only the one

15   instance, which occurred when the brother disclosed it.  That

16   was the subject of those two charges.  There's seven full

17   years that happened before that are not included in that state

18   charge.

19          THE COURT:  Okay.  And the Government proffers that

20   that factor reflects the non-charged, non-convicted behavior

21   that was serial in nature?

22          MR. SHEPARD:  Correct, Your Honor.

23          THE COURT:  Okay, I understand.

24          Come back to the podium, please.

25          I take it that you don't deny or dispute the victim

1    statement in Exhibit D, which underlies the state conviction;

2    is that true?

3                    (Off-the-record discussion.)

4              THE DEFENDANT:  I refute some of it that's in there

5    because not all that happened.  If it -- you know, it was

6    never brought up in the original case.  I was never --

7              THE COURT:  Well, Mr. Shepard has said that the

8    conduct that is explained in Exhibit D culminated in the state

9    prosecution.  So not everything that is referenced here were

10   you prosecuted for, but this pattern of conduct culminated in

11   the state charges and your conviction.  Did you plead to those

12   charges?

13             THE DEFENDANT:  Yes.

14             THE COURT:  So to the extent that this conduct

15   underlies those charges, you've admitted it previously in

16   court, right?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  So to that extent, there may be some

19   equivocations here, but by and large, you accept what's

20   written here as accurate?

21             THE DEFENDANT:  All that's written there is not

22   accurate.

23             THE COURT:  The conduct that underlay the charges in

24   state court, was that accurate?

25             THE DEFENDANT:  What was laid out in court, yes.

1           THE COURT:  Yeah.

2           THE DEFENDANT:  But that's not -- all that that's on

3    that paper was not laid out in the --

4           THE COURT:  But it embodies the same conduct, it

5    embodies the same victims.  It's the pattern of conduct

6    whether you would have some variations on these specific

7    facts.

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  This is the synopsis of the conduct that

10   culminated in the state prosecution of those two charges,

11   right?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  And so to that extent, you accept what's

14   written here as true --

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  -- to the extent that it's incorporated

17   in those charges?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  The presentence report says

20   that you, and I think your first wife, had three children, is

21   that right, of your own birthing?

22          THE DEFENDANT:  Yes -- excuse me?

23          THE COURT:  They were biological children?

24          THE DEFENDANT:  Yes, all three of them.  Three boys.

25          THE COURT:  And then because of the divorce, they

1   went with their mother?

2           THE DEFENDANT:  Yes.  When we got divorced, she got

3   custody, and then she moved out of the area, and I didn't know

4   where she went to, and I didn't see the boys for three or four

5   years or more.

6           THE COURT:  And then those three boys were adopted

7   by another family?

8           THE DEFENDANT:  By the foster parents.

9           THE COURT:  You relinquished your parental rights,

10  right?

11          THE DEFENDANT:  Yes.  Yes, Your Honor.

12          THE COURT:  So all the other children that were in

13  and out of your life in terms of the relationships between you

14  and those children, they were all stepchildren; is that right?

15          THE DEFENDANT:  Except for the youngest one, which

16  is my son, Marshal, which was by --

17          THE COURT:  He's in his 20s now.

18          THE DEFENDANT:  Yes, he's in his 20s now.  He lived

19  with me after I got out of prison.  His mom moved to Florida

20  and he moved back to Indiana and lived with me until he

21  graduated high school.

22          THE COURT:  So were you an active parent of any

23  children other than stepchildren when they were nine years

24  old?  Did the boys reach the age of nine?

25          THE DEFENDANT:  No, just my youngest son, Marshal.

1    I've been in his life his whole life.

2              THE COURT:  Okay.  So do you have a frame of

3    reference for nine year olds?  Can you remember what

4    nine-year-old kids are like?

5              THE DEFENDANT:  Just kids.

6              THE COURT:  Yeah.  Well, they're vulnerable, aren't

7    they?  They're naive and trusting.

8              THE DEFENDANT:  Yeah.

9              THE COURT:  And they're sort of happy go lucky.

10   They count on other people to take care of them.  They are too

11   young to figure out all their needs.  They can't meet them

12   even if they can figure them out.  So it's sort of a time when

13   kids are just kids, and they require a lot of protection at

14   that age.  Do you have a mind, a recall, a mindset about that?

15   Do you remember kids who were under your care at that age --

16             THE DEFENDANT:  Yes.

17             THE COURT:  -- in terms of those qualities?

18             THE DEFENDANT:  Yes.

19             THE COURT:  So when you think about how children are

20   at that age and how undeveloped they are, I mean, they are

21   actually, it's a pretty delightful stage because they are sort

22   of coming into who they are, and they're funny, and they are

23   high energy, and they have friends, and they like to do things

24   with their friends, and they're trying to figure out about

25   school and what to -- whether they like their teachers and how

good a students they are.  So they are sort of coming into life at that stage.

So I mention it because, since you've had this experience, and since you say that you recall it very well, you know how life altering it would be to have those levels of trust breached, and to discover that the people who were supposed to be in their lives to protect them and to help them, and help them figure out about life and relationships, turn out to be the people they fear the most, and the people they have good reason to fear because they've hurt them deeply.

So that's another way of saying a factor that the guidelines allow a court to take into account with respect to vulnerable victims.  Now, it's not a separate guideline factor when it's child pornography and the kinds of crimes that have been perpetrated here that victimize the children.  Yet, that is a factor that is used as an enhancement for other offenses when there's a vulnerable victim.

So that factor would apply to an elderly person who's got dementia, let's say, or is physically impaired in some way, if not mentally.

At the heart of it is this horrific harm that it has caused and the extent to which it ruptures, just tears at the fabric of society, because we know that we have to protect the young and the old in the most solicitous ways as a society.

1   They are our most vulnerable.

2           So when an offense comes along like this that really

3   runs contrary to those deep-seated societal concerns and

4   interests, it results in guidelines and statutes that are just

5   tough.  It's a long time.

6           So in thinking about the nature and circumstances of

7   this offense and the surrounding conduct and the fact that you

8   have a prior criminal history for similar conduct, and the

9   fact that for some reason or another you've not been able to

10  stop this conduct, and that it overtakes you at various times

11  in ways you can't even explain or understand, there is a

12  decided need, a demonstrated need to protect the public and

13  other children especially.

14          So in light of that, a guideline sentence does seem

15  to me to be called for, but I don't think we need to peg this

16  at the high end of the guidelines because, first of all,

17  you've reached not the ripe age of 52 but a substantial age of

18  52.  So whatever sentence is imposed is going to be -- it's

19  going to take you into ripe old age.  And that's one of the

20  points, to punish you, because this behavior is so worthy of

21  punishment.

22          As you know, we've talked about this, there's no way

23  we can correct the harm that you caused.  We can only hope

24  that somehow the children that you victimized get enough

25  therapeutic help to live lives that are meaningful and

1    productive and somehow make their peace with this.

2          Frankly, society doesn't care as much if you make

3    your peace with it.  And I am going to recommend that you have

4    mental health counseling because I think not to do that would

5    be cruel because it would leave you with an impaired ability

6    to accept the full scope of your conduct, and that would have

7    the capacity to leave you overwhelmed by shame.

8          So that's not appropriate for a court of justice to

9    leave you just to wallow in the aftermath of this kind of

10   conduct without some mental health assistance.  So I am going

11   to recommend that.  The other conditions of supervised release

12   were laid out in the report.  There were no objections.  Many

13   of them have to do with the kinds of limitations on you in the

14   future after you get out of prison, and the kinds of

15   responsibilities that you will have for ongoing sexual -- sex

16   offense-based restrictions and counseling and so forth.

17         So all of those, there have been no objections that

18   were laid out and explained, I'm going to impose, but in terms

19   of your period of incarceration, I'm going to recommend that

20   you get -- you be afforded an opportunity to participate in

21   these kinds of sexual predator mental health services.

22         Beyond that, whatever Bureau of Prisons services are

23   available to you, you can decide what you want.  But that's

24   the most important one.  I am going to restrict you from

25   having contact with any of the victims who have made

themselves known to me.  So no letters of apology, no efforts
to explain, no digging out of this hole.  If your therapist at
some point along the way deems that helpful for your recovery,
then it has to go through the United States Attorney's Office
for a decision to be made as to whether to pull the scab off
the wound again, but I am going to impose that limitation on
you while you're incarcerated, that there's to be no contact
with any victim or any alleged victim or any claimed victim or
anybody else of that sort.  You cannot, in that way, do
anything other than add to the damage, and you don't have
permission to do that.

So the period of incarceration that I'm going to
impose is 336 months.  It's not the low end of the guidelines.
It's not even actually halfway through the guidelines, but
it's a little bit up off the bottom end of the guidelines
because that reflects the seriousness of this offense, your
history and characteristics, the need to protect the public,
and for a sentence that is not disparate from other people who
are convicted for similar behavior.

That will be followed by ten years of supervised
release.  I won't impose life because I think it will probably
be tantamount to life by the time you get out, but that will
be the period of supervised release subject to the terms and
conditions that have been imposed, I mean, that are laid out
in the report.  Those I am imposing now.

1          I'm going to impose a $5,000 fine.  It's a
2    substantial departure, but I'm going to recommend and order
3    therefore that this be paid into the Victim Impact Fund that
4    Mr. Shepard referred to earlier that finances therapy programs
5    for victims, even if they can't otherwise document the costs
6    that they would bear.

7          So the $5,000 fine will be imposed as such, but it
8    will be allocated to basically some sort of restitution-based
9    funding program.  The hundred dollar special assessment I've
10   spoken of before is a mandatory fee.  So we'll make that
11   payable through the Inmate Financial Responsibility Program.

12         That's the sentence that I intend to impose and
13   those are my reasons.  Mr. Inman, do you have any legal
14   objection to the sentence or do you request any further
15   elaboration of my reasons?

16         MR. INMAN:  I do not, Your Honor.

17         THE COURT:  And is that true with respect to the
18   supervised release terms?

19         MR. INMAN:  Yes, ma'am.

20         THE COURT:  Mr. Shepard, do you have any objection
21   or request any further elaboration of my reasons?

22         MR. SHEPARD:  No, Your Honor.

23         THE COURT:  Is that true for the supervised release
24   terms as well?

25         MR. SHEPARD:  It is, Your Honor.

1          THE COURT:  The sentence then that I have announced
2     as my intended sentence, Mr. Jenkins, is now the judgment of
3     the Court, and a Judgment and Commitment Order will be drawn
4     up to reflect these elements and they'll bind you in these
5     ways until the judgment's fully satisfied.

6          Now, you do get credit for the time you've served
7     awaiting today's sentencing hearing.  I know that in terms of
8     federal custody, you've been detained since May of 2015.  So
9     that will be counted against the sentence that I've imposed
10    today.

11         Is there a place that you want me to recommend other
12    than a place where he can get the kind of specialized
13    counseling that I've mentioned, Mr. Inman?

14         MR. INMAN:  Your Honor, obviously an appropriate
15    facility given the nature of the offense, and then somewhere
16    close to southern Indiana.

17         THE COURT:  All right.  We'll combine those
18    recommendations, Miss Neat, so that the Bureau of Prisons
19    knows that we'd like to accomplish both of those goals.

20         Now, pursuant to your plea agreement, because this
21    is a guideline sentence, my understanding is that you've
22    waived your right to appeal this decision.  You also as part
23    of your plea agreement gave up your right to appeal the
24    supervised release terms and the fact of the conviction, which
25    is to say a challenge to the merits of the Government case

1    when you pled guilty.

2            So whether or not you intend to take an appeal of

3    this sentence is not a judgment that I make, but you need to

4    talk to Mr. Inman about that.  He will continue to give you

5    the benefit of his excellent advice.  You need to listen to

6    him, but he'll listen to you as well.  If you think you've

7    retained a right to appeal this sentencing decision, you have

8    to file your notice of appeal within two weeks of the entry of

9    the judgment on the docket of the court.

10           Today is Tuesday.  It's likely to be docketed before

11   the week is over.  So you can count the two weeks ahead and

12   know basically when the time would expire.  That's why you

13   need to have this conversation promptly with Mr. Inman, so

14   that you can settle on an agreed strategy going forward.  Do

15   you understand that, Mr. Jenkins?

16           THE DEFENDANT:  Yes, Your Honor.

17

18

19

20

21

22

23

24

25

1    THE COURT:  So is there anything further that the

2    Court needs to address today, Mr. Inman?

3    MR. INMAN:  No, Your Honor, thank you.

4    THE COURT:  Or from you, Mr. Shepard?

5    MR. SHEPARD:  No, Your Honor.

6    THE COURT:  All right.  Thank you again, counsel,

7    very much.  Mr. Jenkins, good luck to you, sir.

8    (Court adjourned at 3:55 p.m.)

9

10

11

12    ****************************************************************

13    CERTIFICATE OF COURT REPORTER

14

15

16    I, Laura Howie-Walters, hereby certify that the

17    foregoing is a true and correct transcript from reported

18    proceedings in the above-entitled matter.

19

20

21    /S/LAURA HOWIE-WALTERS   November 20th, 2020

22    LAURA HOWIE-WALTERS, FCRR, RPR, CSR
     Official Court Reporter
23    Southern District of Indiana
     Indianapolis Division

24

25